### CALMAR S. S. CORPORATION v. TAYLOR. *

### TAYLOR v. CALMAR S. S. CORPORATION.

Nos. 6358, 6419.

Circuit Court of Appeals, Third Circuit.

Sept. 8, 1937.

*Rehearing denied Oct. 14, 1937; writ of certiorari granted 58 S.Ct. 408, 82 L.Ed. ——.

Lewis, Wolff & Gourlay, of Philadelphia, Pa., and Duncan & Mount, of New York City (Frank A. Bull, of New York City, and Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for Calmar S. S. Corporation.

Before THOMPSON and BIGGS, Circuit Judges, and MARIS, District Judge.

MARIS, District Judge.

Both libelant and respondent have appealed from the final decree of the court below in an admiralty case. The libelant was a seaman on respondent's steamship, Losmar, and became afflicted with Buerger's disease while in the service of the ship. Respondent's appeal complains of the allowance by the court below of the sum of $7,000 to libelant as the present value of the cost of his maintenance and cure during the remainder of his life. Libelant appeals from the action of the court below in refusing to award him damages for his injuries suffered, as he contends, because of respondent's negligence.

Libelant at the time of the trial was forty-three years old and had followed the sea for twenty-eight years. He shipped on the Losmar on October 16, 1934, as a fireman. On February 9, 1935, at about 4 o'clock in the afternoon at the beginning of his watch he proceeded into the engine room to take over his duties, and then went into the boiler room through the companionway which led from the engine room. In doing so his right foot struck against some steel retarders that were lying on the floor of the boiler room. These are used to retard the heat and gases in the boilers, and from their use become quite sharp. They are taken out from time to time when the boiler is overhauled, and are placed on the floor of the boiler room. Just as libelant was about to enter the boiler room and before his foot struck the retarders, the electric lights in the ship flickered and went out, and it was in the ensuing darkness that the accident occurred. The lights went out because at the time the electric generators which provide the current for the ship's lights were being changed from the ship's steam to compressed air furnished from the shore, the ship then being in a shipyard at Sparrows Point, Md. There was a sharp conflict in the testimony as to whether the retarders were actually on the floor of the boiler room and as to whether the ship's lights went out at the time of the accident. The court be-

Freedman, Goldstein & Pechner and Howard M. Long, all of Philadelphia, Pa., for Charles W. Taylor.

low, however, found in the affirmative as to both, and we are satisfied to accept its finding.

Libelant's testimony was that following this accident he found that his right shoe had been cut through over the small toe and that the toe had been cut, bruised, and swollen. He washed the wound with mercurochrome, and two days later went to the Marine Hospital at Baltimore where he received medication for the foot. The record of the hospital, however, does not mention a cut or bruise, but refers only to an "inflammatory lesion between fourth and fifth toes" which was diagnosed as "ringworm, right foot." It is undisputed that the condition of libelant's toe grew worse; that on a voyage of the Losmar to the West Coast it was necessary to remove him to a hospital in the Panama Canal Zone on March 12th, where he remained until May 4th, having in the meantime suffered an amputation of the toe; and that, when he was brought back to New York, he was treated at the Marine Hospitals at Ellis Island and Stapleton where he remained until October 3d. During this period his condition was diagnosed as thromboangiitis obliterans, commonly called Buerger's disease. In the course of treatment for this disease he suffered three further amputations, the last involving his entire right leg below the knee. On October 3d he was discharged to the out-patient department to return at intervals for re-examination, and later to be fitted with an artificial limb. He was so fitted in December, 1935, and obtained the limb on January 15, 1936.

On March 24, 1936, libelant filed his libel in personam, setting up two causes of action. The first was for damages under section 33 of the Merchant Marine Act 1920 (46 U.S.C. § 688, 46 U.S.C.A. § 688). In order to recover in this cause of action it was incumbent on the libelant to prove that the personal injuries which he suffered in the course of his employment on the respondent's vessel were the result of negligence imputable to the respondent in failing to provide him a reasonably safe place in which to work. The negligence charged consisted in leaving in an improper place the pile of retarders upon which libelant stubbed his toe and also in permitting the ship's lights to go out without warning. The court below was, however, unconvinced of the respondent's negligence and found as a fact that libelant's injury was not proved to have been due to any negligence imputable to the respondent. With this finding we agree. We think the evidence fairly establishes that the retarders were placed in a customary and proper location. The change of motive power for the generators from steam to compressed air, involving a temporary shutting off of the ship's lights, was also shown to be a customary and necessary operation with which libelant was thoroughly familiar. Under these circumstances we are clear that respondent did not breach its duty to libelant. It was not an insurer, being liable only if the injury was reasonably foreseeable. Pittsburgh S. S. Co. v. Palo (C.C.A.) 64 F.(2d) 198. It could not, however, have foreseen that libelant would walk into the pile of retarders just at the moment the lights went out. It follows that the court below was right in holding that there was no evidence of negligence imputable to respondent.

Libelant's second cause of action presents more serious questions. It was for maintenance and cure, which he claimed for the remainder of his life. It is not disputed that, while in the service of the respondent's vessel, libelant became afflicted with Buerger's disease, in the course of treatment for which he suffered four amputations, finally losing his right leg below the knee. Buerger's disease is an obscure disease of the arteries and veins. It was defined in this case by Dr. Buerger, for whom it was named, as an inflammatory, morbid process of the arteries and veins. Inflammation takes place on the walls of these vessels, most often in the feet and legs. Coincident with this, extensive clotting appears, followed by a process of scar tissue replacement so that the affected arteries and veins are converted into hard fibrous parts, closing off the circulation of the members affected. This is followed subsequently by the secondary and visible effects, lesions, deteriorating changes, and gangrene. The origin of the disease is not known, and there is no known cure. The usual treatment consists of amputation of the affected parts, and this often results in arresting the disease. All the medical witnesses, however, agreed that the disease is incurable and that its manifestations are very likely to recur in other extremities during the life of the patient. They also agreed that regular periodical observation of the patient and continual care and treatment is of great importance in arresting the progress

of the disease. Upon this evidence the court below found that the libelant would require such care for the remaining years of his life and awarded him the sum of $7,000, as the present equivalent of the cost of his maintenance and cure during the remaining period which he may be expected to live.

Respondent strongly argues that in awarding libelant maintenance and cure for the remainder of his life the court below committed error. There is no doubt as to the obligation of a vessel and her owner to provide maintenance and cure for a seaman who falls sick or is wounded in her service. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. This right extends to a fireman. The North America, Fed.Cas.No.10,314, 5 Ben. 486. The word "cure" is used in its original meaning of care, and means proper care of the seaman and not a positive cure, which may be impossible. The Atlantic, Fed.Cas.No. 620, Abb.Adm. 451; The Mars (C.C.A.) 149 F. 729. The duty is to furnish means of cure and to use all reasonable means for that purpose. Brown v. Overton, Fed.Cas. No. 2,024, 1 Spr. 462. This obligation may continue after the voyage ends. Reed v. Canfield, Fed.Cas.No.11,641, 1 Sumn. 195; The Mars, supra; The Bouker No. 2 (C.C.-A.) 241 F. 831, certiorari denied sub nom. Jones v. Bouker Contracting Co., 245 U. S. 647, 38 S.Ct. 9, 62 L.Ed. 529. The duty is to give proper care to the seaman for a reasonable time during which medical treatment may be expected to effect a cure. What is a reasonable time depends on the facts of each case. The Bouker No. 2, supra. The time may, however, extend beyond the time of the seaman's discharge from the hospital. Skolar v. Lehigh Valley R. Co. (C.C.A.) 60 F.(2d) 893.

As we have indicated, the libelant is suffering from an incurable disease contracted while in the service of respondent's vessel. This alone would not entitle him to maintenance and care by the respondent for life, since the obligation of the latter ends when it has provided him with the ordinary means of cure which medical science affords. However, in the present case we have the further fact that the incurable disease from which the libelant suffers is of a progressive nature and is very likely to produce fresh manifestations in the future in other parts of his body. The uncontradicted evidence indicates that continuing care and treatment is of the utmost importance in arresting the further progress of the disease. Under these circumstances we cannot say that the ordinary means which medical science affords for the treatment and care of this disease will be exhausted prior to his death. On the contrary, during the remainder of his life medical care will be necessary to restrain the ravages of the disease. His remaining life is, therefore, a reasonable time during which to provide maintenance and cure. It follows under the principles of the admiralty law to which we have referred that he is entitled to the cost of his maintenance and care from the respondent during the remainder of his life. In so holding we have not overlooked the dicta appearing in a few cases (The Kenilworth [D.C.] 137 F. 1003; Raymond v. The Ella S. Thayer [D.C.] 40 F. 902) to the contrary effect. Those cases were clearly distinguishable on their facts, however, and the question before us was not present in them. The underlying basis for the rule requiring the provision of maintenance and cure is one of common humanity. A seaman rendered helpless in the service of his ship may not be cast adrift, but must be cared for at the ship's expense so long as care is reasonably required and may be effective in checking his malady or curing his wounds and restoring his health. This principle applies with peculiar force to the facts of this case.

One further question remains. Is libelant entitled to an award at this time of the present value of the cost of that maintenance and care during the remainder of his life? The alternative would be to award him in this suit maintenance and care up to the time of trial only and to require him to bring additional suits in the future to recover the amounts expended or incurred by him for maintenance and care during the remainder of his life. This, no doubt, he would have a right to do, but to compel it would be to impose an unwarranted burden upon a disabled seaman. In this case libelant has elected to claim the present value of the amounts which he may reasonably be expected to have to pay in the future. While this is necessarily but an approximation and may in fact turn out to be more or less than the amount actually required, nevertheless we are satisfied that libelant is entitled to receive the cost of his maintenance and cure on this basis if he desires it and can reasonably establish that cost. It is true that re-

88

spondent's obligation, if it does not provide maintenance and care itself, is to reimburse libelant for his expenditures for these purposes, and is not one for damages. But we see no reason why the obligation to reimburse the cost of maintenance and care in the future may not be liquidated on the basis of a lump sum representing the present value of that cost for the period during which, according to the experience of mankind, libelant may be expected to live. This is a liquidation of future payments, not of damages, although it is arrived at in exactly the same way as damages for the loss of future earnings are computed, and we think it provides quite as just a result in the one case as in the other.

■ Respondent finally urges that the amount allowed by the court below, $7,000, is not supported by the evidence and is excessive. As to this we can only say that we have carefully reviewed the evidence and are satisfied that the sum is a reasonable present liquidation of what libelant's maintenance and care may be expected to cost during the remainder of his life.

We conclude that the action of the court below upon each cause of action was right. Its decree is, therefore, affirmed.